*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee/Cross-Appellant,

v

JOSEPH MATTHEW MORRISON,

        Defendant-Appellant/Cross-Appellee.

FOR PUBLICATION
June 09, 2026
2:17 PM

No.  364651
Jackson Circuit Court
LC No.  2020-003172-FH

Before:  CAMERON, P.J., and BOONSTRA and SWARTZLE, JJ.

BOONSTRA, J.

Defendant appeals by right his jury-trial convictions of gang-membership felonies, MCL 750.411u; providing material support for terrorist acts, MCL 750.543k(1)(b); and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced him to 4 to 20 years' imprisonment for gang-membership felonies and providing material support for terrorist acts and 2 years' imprisonment for felony-firearm. We vacate defendant's convictions and remand for further proceedings.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In October 2020, Adam Fox and Barry Croft, Jr. were arrested on federal charges of conspiracy to kidnap Michigan Governor Gretchen Whitmer. A federal jury convicted Fox and Croft of conspiracy to kidnap the Governor and conspiracy to use a weapon of mass destruction, among other charges.[1] Defendant, along with two codefendants,[2] were arrested and charged for their alleged roles in supporting Fox and Croft's plot.

Defendant created a "Wolverine Watchmen" Facebook page on November 25, 2019. He described the Watchmen as "a group of patriots to network and assemble and recruit like-minded

---

[1] *United States v Fox*, 134 F4th 348, 365 (CA 6, 2025).

[2] The codefendants, Pete Musico and Paul Beller, are not parties to this appeal.

-1-

individuals. Develop QRFs[3] and squad tactics," and he instructed group members to "only add people you trust." Among those not to be trusted were "boot lickers," "cops," and "feds." In the days that followed, defendant identified himself as a unit commander, and he instructed group members to move all planning communications to Wire[4] and to message him their usernames to add to the chat. He also indicated that he was in Michigan, living under Governor Whitmer's "tyranny," and that he was "fixing to change all that."

On March 7, 2020, Dan Chappel was scrolling through Facebook when the Wolverine Watchmen was recommended as a group in which he might be interested. Chappel was an army veteran who had maintained an interest in firearms and was looking for pro-Second Amendment people with whom he could train. Chappel was admitted into the group and told that, if he wanted to train, he should download Wire and undergo a vetting process. Chappel downloaded Wire, passed the vetting, and was added to the Watchmen's main Wire chat.

After joining the chat, Chappel saw a post advocating reverse red flag[5] operations and suggesting that members download a hunting application that would allow users to find the addresses of law enforcement officers. Chappel became concerned that the objective of the group's training was to kill law enforcement personnel, and he relayed his concern to a friend who was a local law enforcement officer. The information eventually made its way to FBI Special Agents Jason Chambers and Henrik "Hank" Impola, who recruited Chappel as a "confidential human source." Chappel gave the agents access to his Wire and Facebook accounts, which allowed the agents to see the Watchmen's communications to Chappel.

Over the next several months, Chappel reported the Watchmen's activities to the FBI. He also wore a recording device to Watchmen events that allowed the FBI to monitor the events live. Chappel communicated with Watchmen on Wire, became a leader of the group, took an active role at a number of field training exercises at defendant's property in Munith, attended rallies at the state capitol, attended national meetings in Wisconsin and Ohio, witnessed the progression of defendant's association and communications with Croft and Fox, and participated in QRF deployments and two surveillances of Governor Whitmer's vacation residence. On the basis of information gleaned from the FBI's access to Watchmen communications and provided by

---

[3] QRF stands for quick reaction (or response) force. A quick response force is a team that is willing to respond to a situation while armed. It is a term used in the military.

[4] FBI Special Agent Henrik "Hank" Impola explained at trial that Wire provided a platform for end-to-end encrypted chats that could be set to auto-delete. The company that runs Wire is not located in the United States and is not subject to United States laws. Special Agent Impola explained that "because of the end-to-end encryption, [Wire] doesn't actually physically hold the, the content." And because the company does not store the content, the FBI could not obtain the content by subpoena.

[5] Red flag laws permit the temporary removal of guns from individuals deemed a risk, typically because they are exhibiting threatening behavior or mental-health crises. Reverse red flag operations are attacks on the homes of law enforcement officers in retaliation for red flag arrests. At the time of the events underlying this appeal, Michigan did not have a red flag law; the Extreme Risk Protection Order Act, MCL 691.1801 *et seq*., became effective on February 13, 2024.

Chappel, defendant was arrested on October 7, 2020 and eventually charged with one count each of gang-membership felonies, providing material support for terrorist acts, and felony-firearm.

After a trial lasting over two weeks, a jury convicted defendant on all counts. In an omnibus motion for postconviction relief, defendant argued, *inter alia*, that the evidence supporting his convictions was legally insufficient because kidnapping did not satisfy the statutory definition of a "violent felony," so any material support that he allegedly provided for Croft and Fox's plan to kidnap the Governor was not material support for an act of terrorism, which by statute must be a violent felony. Defendant contended that to the extent that at least some of the jurors may have agreed with the prosecution that the purported plot to kidnap the Governor was the underlying terrorist act, this was contrary to the statutory language and this Court's interpretation of it. And without an underlying terrorist act, the prosecution failed to prove all the required elements of the two charges, thereby warranting a directed verdict of acquittal. Defendant also argued that his conviction of felony-firearm should be dismissed because it could not stand absent an attached felony.

The trial court rejected this argument without reaching the issue whether kidnapping was a violent felony because, according to the trial court, the prosecution presented evidence about plans to possibly kill the Governor, and murder was unquestionably a violent felony. This appeal and cross-appeal followed.

## II. JURY INSTRUCTIONS

Defendant facially challenges the legal sufficiency of the evidence underlying his convictions. However, the essence of his argument on appeal is that kidnapping cannot constitute an "act of terrorism" as that term is used in Michigan's Antiterrorism Act (the Act), MCL 750.543a *et seq*. And because the jury instructions given by the trial court allowed for a conviction based on an underlying kidnapping offense, his conviction cannot stand. We agree that the charge of kidnapping cannot properly form the basis for defendant's conviction.

## A. STATUTORY INTERPRETATION

Defendant argues that kidnapping is not a "violent felony" that can support a conviction under MCL 750.543k(1)(b) (providing material support for an act of terrorism). We agree.

Determining whether kidnapping is a "violent felony" as defined by MCL 750.543b(h) requires analysis of the language contained in the Act. "The foremost rule of statutory construction is to discern and give effect to the intent of the Legislature." *People v Lyon*, 310 Mich App 515, 517; 872 NW2d 243 (2015). The most reliable evidence of the Legislature's intent is the plain language of the statute. *People v Lewis*, 503 Mich 162, 165; 926 NW2d 796 (2018). "If the statute's language is clear and unambiguous, then judicial construction is inappropriate, and the statute must be enforced as written." *Id*.

As already indicated, the jury convicted defendant of violating MCL 750.411u (gang-membership felonies), MCL 750.543k(1)(b) (providing material support), and MCL 750.227b (felony-firearm). Conviction under MCL 750.411u requires an underlying felony:

(1) If a person who is an associate or a member of a gang *commits a felony or attempts to commit a felony* and the person's association or membership in the gang provides the motive, means, or opportunity to commit the felony, the person is guilty of a felony punishable by imprisonment for not more than 20 years. [MCL 750.411u(1) (emphasis added).]

The underlying felony for defendant's conviction of gang-membership felonies, as well as his conviction of felony-firearm, was defendant's conviction under MCL 750.543k(1)(b). A person violates MCL 750.543k(1)(b) when he

[k]nowingly provides material support or resources to a person knowing that the person will use that support or those resources in whole or in part to plan, prepare, carry out, facilitate, or avoid apprehension for committing *an act of terrorism* against the United States or its citizens, this state or its citizens, or a political subdivision or any other instrumentality of this state or of a local unit of government. [Emphasis added.]

An "act of terrorism" is defined as follows:

(a) "Act of terrorism" means a willful and deliberate act that is all the following:

(*i*) An act that would be a *violent felony* under the laws of this state, whether or not committed in this state.

(*ii*) An act that the person knows or has reason to know is dangerous to human life.

(*iii*) An act that is intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion. [MCL 750.543b(a) (emphasis added).]

A "violent felony" is defined as follows:

[A] felony in which *an element is the use, attempted use, or threatened use of physical force against an individual*, or the use, attempted use, or threatened use of a harmful biological substance, a harmful biological device, a harmful chemical substance, a harmful chemical device, a harmful radioactive substance, a harmful radioactive device, an explosive device, or an incendiary device. [MCL 750.543b(h).]

-4-

When the Act was passed and became effective in 2002,[6] the statutory definition of kidnapping read as follows:

> Any person who wilfully, maliciously and without lawful authority shall *forcibly* or secretly confine or imprison any other person within this state against his will, or shall *forcibly* carry or send such person out of this state, or shall *forcibly* seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years. [MCL 750.349, as enacted by 1931 PA 328, effective September 18, 1931 (emphasis added).]

But in 2006, our Legislature amended MCL 750.349 and enacted MCL 750.349b.[7] The enactment of MCL 750.349b added the crime of unlawful imprisonment.[8] The 2006 amendment to MCL 750.349 removed from the kidnapping statute all references to force:[9]

> (1) A person commits the crime of kidnapping if he or she knowingly restrains another person with the intent to do 1 or more of the following:
>
> (a) Hold that person for ransom or reward.
>
> (b) Use that person as a shield or hostage.
>
> (c) Engage in criminal sexual penetration or criminal sexual contact prohibited with that person.
>
> (d) Take that person outside of this state.

___

[6] 2002 PA 113, effective April 22, 2002.

[7] MCL 750.349 was amended by 2006 PA 159, effective August 24, 2006. MCL 750.349b was added by 2006 PA 160, effective August 24, 2006.

[8] The crime of unlawful imprisonment includes the use of force as an element. Specifically, "[a] person commits the crime of unlawful imprisonment if he or she knowingly restrains another person" under certain circumstances. MCL 750.349b(1). " 'Restrain' means to *forcibly* restrict a person's movements or to *forcibly* confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a) (emphasis added).

[9] MCL 750.349 was further amended by 2014 PA 330, effective January 14, 2015, which inserted "prohibited under chapter LXXVI" into Subsection (c) and added Subsection (f), which refers to engaging in child sexually abusive activity. The 2014 amendment is not relevant to this appeal.

(e) Hold that person in involuntary servitude.

(2) As used in this section "restrain" means to restrict a person's movements or to confine the person so as to interfere with that person's liberty without that person's consent or without legal authority. The restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts. [MCL 750.349, as amended by 2006 PA 159, effective August 24, 2006.]

Because the "use, attempted use, or threatened use of physical force" is not an element of kidnapping, kidnapping is not a "violent felony" falling within the definition of an "act of terrorism" under MCL 750.543b(a).[10] This Court reached the same conclusion in *People v Quigley*, unpublished per curiam opinion of the Court of Appeals, issued January 19, 2016 (Docket No. 322482), slip op at 5,[11] concluding that "kidnapping is not a 'violent felony' as defined in MCL 750.543b(h)" because "[f]orce is not a required element of the offense."

The prosecution offers several reasons why kidnapping should be considered a violent felony for purposes of defining an act of terrorism, none of which is persuasive. First, the prosecution notes that Michigan's kidnapping statute "*does* require the prosecution to prove an element of force *depending on the type of kidnapping charged*, at least as those types of kidnapping are addressed by Michigan's standard criminal jury instructions." As the prosecution recognizes, however, these instructions do not have the force of law. Jury instructions are intended to accurately state applicable law, but they are not legal authority. See *State Farm Fire & Cas Co v Couvier*, 227 Mich App 271, 273 n 1; 575 NW2d 331 (1998); *In re Condemnation of Private Prop to Acquire Land for Detroit Metro Wayne Co Airport*, 211 Mich App 688, 692; 536 NW2d 598 (1995) ("Jury instructions do not establish substantive law."). Indeed, it is apparent that some of the kidnapping instructions are patterned after MCL 750.349 as originally enacted, not as it currently exists. The general jury instruction for kidnapping, M Crim JI 19.1, was adopted in September 2006 and is consistent with the amended language of MCL 750.349 (i.e., the instruction does not mention force). But the instructions that the prosecution cites predate the 2006 amendment to the kidnapping statute, yet they have never been amended and continue to state a

---

[10] The legislative history of MCL 750.349, although generally not in and of itself persuasive, see *People v Gardner*, 482 Mich 41, 57-58; 753 NW2d 78 (2008), supports our interpretation from the plain language of the Act, that the Legislature intended to remove language referring to force from the statutory definition of kidnapping and to relegate force language to the statute defining unlawful imprisonment. See Michigan Senate Fiscal Agency Bill Analysis, HB 5450, 5/10/2006 (quoting the preamendment version of MCL 750.349, noting that HB 5450 would delete that version and replace it with the version that does not use force language); Michigan House Fiscal Agency Bill Analysis, HB 5450, 2/13/2006 (noting that HB 5450 (kidnapping) used "restrict" but HB 5451 (unlawful imprisonment) used "forcibly restrict").

[11] Although unpublished opinions are not binding precedent, this Court may consider them as instructive or persuasive. *People v Kloosterman*, 296 Mich App 636, 641 n 2; 823 NW2d 134 (2012).

requirement that "the defendant forcibly confined or imprisoned" the complainant, consistent with the older version of the statute. See M Crim JI 19.2 (underlying offense of murder or crime involving murder); M Crim JI 19.3 (intent to extort money or other valuables); M Crim JI 19.4 (secret confinement of victim); M Crim JI 19.5 (holding victim for labor or services).

Second, the prosecution urges this Court to look to the federal antiterrorism statutes, noting that the Act "largely mirrors the federal statute," and "the federal statute *repeatedly* refers to the (federal) offense of kidnapping." See, e.g., 18 USC 2331(1)(B)(*iii*); 18 USC 2332b(a)(1)(A) and (c)(1)(B). From this, the prosecution concludes that, "[i]f kidnapping was expressly contemplated by the legislature that drafted the federal anti-terrorism statute, it likewise had to have been contemplated by the drafters of Michigan's anti-terrorism statutes by virtue of the fact that the Michigan legislature adopted much of the same language as the federal statute." It is possible that the Legislature had in mind kidnapping as an act of terrorism when the Act was passed in 2002 because at that time, the statutory definition of kidnapping included an element of unlawful confinement that was willful, malicious, and accomplished by force or coercion, thereby satisfying the requirement that a "violent felony" must involve "the use, attempted use, or threatened use of physical force against an individual." However, when the Legislature amended the kidnapping statute in 2006, it excluded any reference to force. As a result, kidnapping falls outside the Act's definition of a violent felony.

Third, the prosecution points out that, if the Legislature did not intend for kidnapping to be an act of terrorism, then it makes no sense for the second element of an act of terrorism, MCL 750.543b(a)(*ii*), to include a reference to the kidnapping statute. MCL 750.543b(b), which was enacted in 2002 and never amended, defines "dangerous to human life" to mean "that which causes a substantial likelihood of death or serious injury or that is a violation of [MCL 750.349 (the kidnapping statute)] or [MCL 750.350]."[12] Indeed, kidnapping may be dangerous to human life, but as now defined, it cannot be a violent felony for purposes of satisfying the first element of an act of terrorism, MCL 750.543b(a)(*i*) (or therefore for purposes of satisfying the material-support statute) because it lacks an element of force. The 2006 amendment of the kidnapping statute rendered essentially meaningless the inclusion of the kidnapping statute as part of the definition of "dangerous to human life." The prosecution's solution is to assume that the Legislature intended kidnapping to be an act of terrorism. However, this is not a viable solution, given the canons of statutory construction that require courts to presume that the Legislature intended the meaning that it plainly expressed, *People v Gardner*, 482 Mich 41, 50; 753 NW2d 78 (2008), and to refrain from speculating as to the intent of the Legislature beyond the language expressed in the statute, *People v Jackson (On Reconsideration)*, 313 Mich App 409, 424 n 3; 884 NW2d 297 (2015). To the extent that MCL 750.543b(b)'s reference to kidnapping became nugatory after the 2006 amendment of MCL 750.349, we leave that apparent oversight to the Legislature. But under the plain language of the statutes as they currently exist, kidnapping is not an act of terrorism.

Because of that conclusion, we hold that defendant's conviction could not properly be predicated on kidnapping as the underlying act of terrorism.

---

[12] MCL 750.350 is not at issue.

## B. THE JURY INSTRUCTIONS TAINTED THE VERDICT

The prosecution further contends that even if this Court concludes that the Michigan offense of kidnapping is not a violent felony for purposes of Michigan's antiterrorism statutes, defendant's convictions may be affirmed nonetheless because "kidnapping was not the only planned felony that the jury considered when deciding whether defendant and his co-defendants provided material support for a terrorist act." According to the prosecution, the broad scope of the plot included harming or killing law enforcement officers and politicians, kidnapping and possibly killing the Governor, and using explosive devices as part of the kidnapping plot.

It is true that the prosecution presented evidence of multiple violent felonies that were discussed and possibly even planned. However, with respect to what constitutes an act of terrorism, the trial court instructed the jury as follows:

> An[] act of terrorism is committed or attempted to be committed or attempting to commit the violent felony of murder, assault with intent to commit murder, assault with intent to commit great bodily harm, arson or kidnapping that would be dangerous to human life and was intended to intimidate or coerce the civilian population or influence or affect the conduct of the government or a unit of government through intimidation or coercion.

In addition, the trial court further identified "violent felonies" as "[m]urder, assault with intent to commit murder, assault with intent to commit great bodily harm, arson and kidnapping."

"This Court reviews jury instructions as a whole to determine if the trial court made an error requiring reversal. Even if somewhat imperfect, jury instructions are not erroneous if they fairly present the issue for trial and sufficiently protect the defendant's rights." *People v McLaughlin*, 258 Mich App 635, 668; 672 NW2d 860 (2003) (citation omitted). "Reversal is warranted only if after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative," meaning that it "undermined the reliability of the jury verdict." *People v Mitchell*, 301 Mich App 282, 286, 289; 835 NW2d 615 (2013). Because kidnapping is not a violent felony as defined by MCL 750.543b(h), it cannot support a conviction under MCL 750.543k, and the trial court's instructions to the contrary were erroneous.[13]

That error requires reversal because it allowed the jurors to find defendant guilty on an invalid basis. The verdict form asked only whether defendant was guilty (or not) of "Providing Material Support for an Act of Terrorism." Therefore, we cannot determine the extent to which the jury based its conviction on the underlying felony of kidnapping as opposed to murder or some

---

[13] We note that defendant waived any issue with the trial court's jury instructions on the elements of the offense when defense counsel expressed to the trial court that he had no objection to the final proposed instructions. But we nonetheless review the error to the extent that it is necessary to determine whether the jury convicted defendant on an invalid basis. See *People v Eisen*, 296 Mich App 326, 329-330; 820 NW2d 229 (2012) (reviewing a waived claim of instructional error because it was necessary to resolve a claim of ineffective assistance of counsel).

other offense. See *People v Urbanski*, 348 Mich App 90, 111; 17 NW3d 430 (2023) ("[A] conviction cannot stand if a reviewing court cannot discern whether the conviction was based on a theory for which there was insufficient evidence."). Given that the trial court specifically instructed the jury to consider kidnapping as a violent felony and that the jury heard considerable testimony about the plot to kidnap Governor Whitmer, the likelihood that defendant was actually convicted, at least in part, on an invalid basis tainted the jury's verdict. See *id*. at 114 ("If there is no way to know if the jury chose the impermissible theory then it follows that there is a reasonable probability that the jury did choose the impermissible theory."). Accordingly, we vacate defendant's conviction of providing material support for an act of terrorism. And because that offense was the underlying felony for the gang-membership felonies and felony-firearm convictions, we vacate those convictions as well.[14]

We note that the trial court presented the impermissible theory of kidnapping as the violent felony along with other, permissible theories, such as the theories that murder or assault to commit great bodily harm were the violent felony. Because the reasonable probability that the jury chose, at least in part, the impermissible theory requires reversal regardless of defendant's guilt or innocence in relation to the other theories, see *id*., we remand for a new trial without addressing the sufficiency of the evidence for defendant's convictions under any other theory. See *Evans v Mich*, 568 US 313, 318-319; 133 S Ct 1069; 185 LE2d 124 (2013) (holding that a retrial after "rulings on questions that are unrelated to factual guilt or innocence" does not violate the Double Jeopardy Clause) (quotation marks and citation omitted); *People v Thompson*, 424 Mich 118, 126; 379 NW2d 49 (1985) (noting that the Double Jeopardy Clause of the Michigan Constitution provides the same protections as the federal clause).[15]

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Thomas C. Cameron
/s/ Brock A. Swartzle

---

[14] Because we have vacated all defendant's convictions, we do not address defendant's other issues on appeal or the prosecution's issue on cross-appeal.

[15] Defense counsel conceded at oral argument that double jeopardy would only apply to the extent the prosecution were to retry this case using kidnapping as a predicate offense, and that otherwise this case could be retried.